# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **CASE NO: 8:23-cr-475-MSS-AEP**

**NICOLETTE RENEE NICOLETTI**

_____

## ORDER

**THIS CASE** is before the Court for consideration of Defendant Nicolette Renee

Nicoletti's Motion to Suppress Illegally Obtained Evidence, (Dkt. 65), Defendant's

Supplement to the Motion to Suppress, (Dkt. 86), and the Government's response

thereto. (Dkt. 91) Also before the Court is Defendant's Motion to Disqualify Counsel

for the Government, (Dkt. 66), and the Government's response. (Dkt. 74)

Additionally, the Court considers Defendant's Motion to Dismiss the Indictment for

Loss or Destruction of Exculpatory Evidence, (Dkt. 67), and the Government's

response thereto. (Dkt. 75) The Court held an evidentiary hearing on Defendant's

motions on November 18, 19, 20, and December 2, 2024. At the close of the hearing

on December 2, 2024, the Court granted the Parties leave to file supplemental briefing

on the issues raised in the motions and during the hearing. (Dkt. 116 at 162:7-11) The

Court therefore also considers the Parties' supplemental briefs, (Dkts. 123, 124, 125),

and the responses in opposition. (Dkt. 133, 134, 135) Upon consideration of all

relevant filings, case law, and being otherwise fully advised, the Court **DENIES**

Defendant's Motions.

## I.    BACKGROUND

The Indictment in this case alleges that Defendant Nicolette Nicoletti, an attorney licensed in Florida who owns and operates the Nicoletti Law Firm ("NLF"), engaged in a wire fraud scheme between March 2017 and November 2018. (Dkt. 1) Together with her husband, Anthony Nicoletti, and Anthony LoGrasso, who were then NLF employees, Defendant allegedly used fraudulent settlement statements to divert funds from NLF clients' personal injury settlements to a shell company or to LoGrasso. (Id.) In the Indictment, the Government alleges Defendant, Mr. Nicoletti, and LoGrasso shared in the proceeds of the allegedly diverted funds. (Id.)

At the evidentiary hearing on Defendant's Motions, the Court heard testimony from LoGrasso, Brian Tannebaum, Stacy Kemp, Pasco County Sheriff's Office ("PSO") Detective Todd Gasparino, FBI Special Agent Michael Klepac, Carter Conrad, Jr., FBI Special Agent Nigel Lewis, former PSO Detective Shawn Rozankowski, and FBI Special Agent Thuy Hibbitts. The following statement of facts reflects the Court's factual findings based on the record developed at the hearing.

### a.  LoGrasso's Conduct

From January 2017 to February 2020, NLF employed LoGrasso as a legal assistant and/or paralegal. (Dkt. 111 at 33:4-6; 42:25–43:2; 44:11-15) During his employment with NLF, LoGrasso was also the president of a company called Anesthesia Services of PR, Inc. ("ASPR"). (Dkt. 113 at 32:1-23) From June 2017 to September 2018, ASPR received eleven checks from NLF, each signed by Defendant,

which ranged in amounts from $2,000.00 to $9,800.00. (Gov't Ex. 2) The memo line of each check identified the name of an NLF client for whom NLF had negotiated and closed a personal injury settlement. (Id.; see Dkt. 111 at 107–108) Later, in 2021, LoGrasso would explain to law enforcement that he believed Defendant and Mr. Nicoletti used ASPR to steal money from NLF clients. (Gov't Ex. 1-T at 6, 13, 24) LoGrasso alleged they did so by including a fraudulent charge by ASPR on NLF clients' settlement statements. Because of ASPR's name, the charge appeared to be for the administration of anesthesia during a surgical procedure. ASPR, however, did not provide anesthesia to any NLF client. The surgery centers that performed the clients' surgeries provided the anesthesia, and the cost of the anesthesia was therefore included in the charges by those surgery centers. (Gov't Ex. 3 at 2) Thus, LoGrasso alleged NLF double-billed its clients for anesthesia and pocketed the duplicative funds. (Id.) Mr. Nicoletti or Defendant would write a check from the client's settlement award to ASPR in the amount of the ASPR charge reflected on the settlement statement. Mr. Nicoletti would then direct LoGrasso to deposit the check in ASPR's bank account, withdraw a portion of the deposit (e.g., $4,000), and bring the cash to the NLF office. (Gov't Ex. 1-T at 6) LoGrasso facilitated the scheme by acting as ASPR's president, opening a bank account for ASPR with Chase Bank, and making deposits and withdrawals from the account at Mr. Nicoletti's direction. (Id.)

Sometime in 2018, Mr. Nicoletti required all NLF employees to execute a non-disclosure agreement, which LoGrasso did. (Id. at 9; Dkt. 111 at 82:24-25; 86:13-25) Then, in November or December 2019, Mr. Nicoletti provided NLF employees with

an employee handbook that contained language about confidentiality. (Id. at 82:24–83:3; 86:4–87:10)

Between the time LoGrasso received the employee handbook at the end of 2019 and his leaving NLF's employ in February 2020, LoGrasso copied the entire contents of NLF's server or cloud onto an external thumb drive, including confidential files and files subject to the attorney-client privilege.[1] (Id. at 33:13-17; 82–86) He did so without Defendant's permission. (Id. at 33:13-17) LoGrasso kept the thumb drive and used it to copy and save the NLF Files to his personal desktop computer and a laptop he used for work. (Id. at 41:10-13) LoGrasso testified that he copied the NLF Files to protect himself if NLF fired him. (Id. at 84:23-24) LoGrasso also testified that he would often refer to the NLF Files as samples or templates of legal work product to assist him in his work as a paralegal, even after he no longer worked at NLF. (Id. at 64:3-14) He estimated he had reviewed approximately thirty to fifty percent of the NLF Files. (Id.)

In September 2020, LoGrasso requested copies of all checks deposited to and made from the ASPR bank account with Chase Bank. (Id. at 106:21-25; Gov't Ex. 2) He received twelve checks: eleven checks deposited to ASPR's account, and one check written from the ASPR to NLF. (Gov't Ex. 2) Each of these checks identified an NLF client: R.M., F.D., Ed.C., F.C., A.C., E.C., M.N., P.S., G.M., E.B., B.H., and R.S. (Id.)

After LoGrasso's employment with NLF ended in February 2020, he began

---

[1] In this Order, the Court refers to the files LoGrasso copied to the thumb drive as the "NLF Files."

working for Sara Berge, another attorney with her own practice. (Id. at 43:1-2; 115:7-11) At some point during his employment with Berge, LoGrasso explained to her that he had concerns about NLF and ASPR. (Id. at 115:12-21) NLF had previously represented Berge in a personal injury settlement, so Berge asked LoGrasso if he knew whether NLF had taken money from her settlement. (Id. at 116–117) LoGrasso did not know. To find out, he retrieved the copy of Berge's closing statement from the NLF Files on his personal devices, and Berge requested NLF fax her a copy of her closing statement, which NLF did on March 10, 2021. (Id. at 119:9; Gov't Ex. 5B) LoGrasso and Berge compared the two documents. (Dkt. 111 at 119:9; see Gov't Exs. 5A and 5B) Berge had initialed and signed the copy of her closing statement that NLF faxed her. (Gov't Ex. 5B) She had not initialed and signed the copy LoGrasso pulled from the NLF Files. (Gov't Ex. 5A) The total amount of Berge's settlement was the same on both documents, but the itemized expenses were different. The copy from LoGrasso's laptop—from the NLF Files—showed a payment from Berge's settlement to Spine Centers of America for $35,500, and a payment to LoGrasso—not ASPR—for a loan of $6,500. (Dkt. 111 at 123:2-16) The copy NLF faxed to Berge showed a payment to Spine Centers of America for $42,000 and no payment to LoGrasso for any loan. (Id. at 124) LoGrasso never loaned Berge any money. (Id. at 125:8-9)

In August 2021, LoGrasso contacted Stacy Kemp, a personal injury attorney in Pasco County who competed with Defendant for business. (Id. at 213–15, 220–21) In a meeting that lasted two to three hours, LoGrasso explained to Kemp his belief that Defendant and her husband had executed a scheme to steal money from NLF's clients.

(Id. at 57:4-11; 247–48) LoGrasso told Kemp he wanted to bring information about the alleged scheme to law enforcement. (Id. at 247:2-5)

LoGrasso advised that he knew about the scheme because he played an integral role in its execution as the president of ASPR. LoGrasso told Kemp he had copies of the checks written from NLF to ASPR. (Id. at 248:4-9) Additionally, LoGrasso told Kemp that when he was an NLF employee, he lawfully had access to and could review NLF records, some of which evidenced the alleged scheme. (Id. at 81:12-25; 248:4-9) LoGrasso told Kemp during their meeting, which occurred after his termination from NLF, that he still had possession of these files and had already collected documentation of the scheme. (Id. at 248:4-12) However, LoGrasso showed Kemp no documentation of the scheme, and LoGrasso did not identify any clients to Kemp by name. (Id. at 61:7-13)

### b. The State Attorney's Conduct

LoGrasso told Kemp he was concerned that he would be charged criminally if he provided law enforcement with information about ASPR. (Id. at 247:2-9) So, during the meeting between LoGrasso and Kemp, Kemp called Bruce Bartlett, the state attorney for Pasco County, with whom Kemp has a friendly relationship. (Id. at 57:23–58:6; 220:11-24; 223:3-11) Kemp had a five to 10 minute conversation with Bartlett about LoGrasso; however, Kemp never identified LoGrasso by name. (Id. at 223:12-15; 229:1-9) Kemp sought to secure immunity from prosecution for LoGrasso in exchange for LoGrasso's cooperation in a law enforcement investigation into LoGrasso's allegations. (Id. at 224:8-10) Kemp could not remember if she identified

NLF, Mr. Nicoletti, or Defendant by name during her phone call with Bartlett. (Id. at 224:20–225:13)

During this brief phone call, Bartlett told Kemp that if LoGrasso cooperated, he would be considered a witness in any resulting investigation and would not be prosecuted. (Id. at 226:24–227:1) This agreement was not memorialized in writing. (Id. at 232:2-12) Nonetheless, the agreement was maintained and honored throughout the investigation that led to Nicoletti's indictment.

After Kemp's phone call with Bartlett, a date and time was set for a meeting at which LoGrasso would provide PSO investigators with his story and the documentation. (Id. at 248:24–249:15) LoGrasso testified Kemp told him to bring "everything" they had discussed to the meeting. (Id. at 142–43) LoGrasso did not remember Kemp telling him to bring anything specific. (Id.) Kemp testified she did not discuss in detail what LoGrasso should or would bring to the meeting with the PSO investigators. (Id. at 251:11-15)

To prepare for the meeting, LoGrasso reviewed the NLF Files for the twelve clients whose names appeared on the eleven checks written from NLF to ASPR and the one check written from ASPR to NLF (the "ASPR victims").[2] (Id. at 66–67) He created a thumb drive with all the NLF Files. (Gov't Ex. 20) In a subfolder on the thumb drive titled "Files for Review," LoGrasso placed copies of the NLF files for the twelve ASPR victims. (Id.; Dkt. 111 at 66–67) LoGrasso testified that no one gave him

---

[2] The memo line of the one check written from ASPR to NLF identified an NLF client, E.C., and stated, "Cashed in error." (Dkt. 113 at 33–34; Gov't Ex. 2 at 11)

any direction as to what files to pull aside, what to collect, or how to organize the
thumb drive. (Id. at 126:13-16)

### c. The PSO Investigation

On August 23, 2021, LoGrasso, Kemp, and Berge met with PSO investigators
at Kemp's office. (Dkt. 112 at 15:9-15; 17:1-3) No one from the state attorney's office
attended the meeting. (Dkt. 111 at 240:7-13) The PSO investigators present were Ryan
Kmiec, Todd Gasparino, and Shawn Rozankowski.[3] (Dkt. 112 at 15:9-15) During the
meeting, LoGrasso told the PSO investigators about his relationship with Mr. Nicoletti
and Defendant, how his employment with NLF came about, and how he believed Mr.
Nicoletti and Defendant used ASPR in a fraudulent scheme. (Gov't Ex. 1-T) LoGrasso
explained to the investigators that he had placed the NLF Files on a thumb drive,
which he would give them after the meeting. (Id.; Dkt. 111 at 240–41) Kemp inserted
the thumb drive into her Macbook laptop and projected its contents onto a large screen
in her office for the investigators to view. (Id.) LoGrasso explained how he had
organized the files into folders and described generally the contents of each folder.
(Gov't Ex. 1-T)

LoGrasso further explained that he had separated out the files the investigators
needed to look at to understand the ASPR scheme and put them in the "Files for
Review" folder. (Id.) The "Files for Review" folder contained one subfolder for each
of the ASPR clients. (Gov't Ex. 20) LoGrasso testified he had reviewed all the files in

---

[3] Rozankowski no longer works for the PSO.

the "Files for Review" folder before the meeting with the PSO investigators. (Dkt. 111 at 65–66) LoGrasso used Kemp's screen to project documents from one of the ASPR clients' folders,[4] including a demand letter, medical bills, and a closing statement, to explain how they evidenced the alleged ASPR scheme. (Dkt. 112 at 28:17-21; Gov't Ex. 1-T) LoGrasso also projected a scanned copy of the twelve checks associated with the ASPR bank account that correspond to an ASPR client. (Gov't Ex. 1-T) Finally, LoGrasso showed the investigators that he had put ASPR's articles of incorporation on the thumb drive. (Dkt. 113 at 31:13-18) The articles of incorporation identified LoGrasso as the president of ASPR. (Gov't Ex. 11)

At the meeting, LoGrasso and Berge described to the PSO investigators how they believed NLF took money from Berge's settlement, and they projected on the screen the NLF copy of Berge's settlement statement that reflected the repayment of a "loan" to LoGrasso. (Gov't Ex. 1-T) Berge told the investigators that she never received a loan from LoGrasso, and LoGrasso told them he never received any money for the repayment of such a loan. (Id.)

LoGrasso gave the PSO investigators the thumb drive when the meeting ended. (Gov't Ex. 3 at 3) He said during the meeting that he had not reviewed every single file on the thumb drive. (Gov't Ex. 1-T)

The PSO investigators did not ask LoGrasso if he initially downloaded or continued to possess the NLF Files without permission. (Id.; Dkt. 112 at 27–28)

---

[4] LoGrasso projected documents from E.B.'s folder as an exemplar. (Gov't Ex. 1-T)

Gasparino never asked the clients for permission to view their files. (Id. at 30:17-21) Neither Gasparino nor Rozankowski ever contacted Defendant to inform her that LoGrasso had copied her files from her server or cloud. (Id. at 30–31; 45:8-11) Gasparino testified no one provided him information about how to handle the confidentiality or HIPAA requirements related to law firm files or medical records. (Id. at 33:8-12) Gasparino, Rozankowski, and Kemp each testified that they did not believe LoGrasso's downloading of the NLF Files was wrongful even though he told them he had signed non-disclosure and confidentiality agreements.

After the August 23, 2021 meeting, Rozankowski uploaded the contents of the thumb drive to evidence.com. (Id. at 28:20-24) When they were uploaded, LoGrasso's folders were deleted, and the files were no longer organized. (Id. at 28:25–29:4) Rozankowski decided that a search warrant was not needed for him to search through the NLF Files on evidence.com. (Id. at 48:24–49:4)

On August 27, 2021, Rozankowski submitted requests for subpoenas of certain banks to the state attorney's office. (Id. at 66:6-13; Dkt. 113 at 43:12-15) Rozankowski's subpoena requests identified the ASPR account with Jefferson Bank and Center State Bank by the account number that was printed on the ASPR checks. (Gov't Ex. 3 at 7, 16) The request for Chase Bank did not identify an account by an account number. (Id. at 25) From these banks, Rozankowski subpoenaed all open and closed accounts from January 2016 to August 27, 2021 for all records "pertaining to the following individuals and business entities . . . as well as any other entity in which these individuals or entities may have a financial interest[,] [t]o include all accounts in

which these individuals had signatory authority and/or the right of withdrawal." (Id.
at 7, 16, 25) The individuals and entities named were Defendant, Mr. Nicoletti,
LoGrasso, NLF, and ASPR. (Id.) The requests expressly sought any documents the
banks had related to NLF and ASPR. The requests did not seek documents only from
the accounts identified by the routing or account numbers. (Id.; Dkt. 113 at 43:16-23)
In support of the subpoena requests, Rozankowski submitted a report that summarized
the meeting with LoGrasso and identified twenty-one NLF clients who were suspected
victims of fraud, some of whom were not ASPR clients. (Gov't Ex. 3 at 5; Def. Ex. 9
at 5)

Rozankowski discovered the suspected victims of fraud who were not ASPR
victims by searching through the NLF Files. To prepare the subpoena requests,
Rozankowski reviewed files and documents related to the ASPR victims. (Dkt. 113 at
51) When he reviewed the settlement statements for Ed.C., E.C., and F.C., he saw
that each statement included an expense for the repayment of a loan to Stacy Carlton.
(Id.) Rozankowski believed this pattern was suspicious, so he searched for other
settlement statements that also identified a loan to Stacy Carlton. (Id. at 52) In doing
so, he reviewed some files that had not been saved in LoGrasso's "Files for Review"
folder. (Dkt. 112 at 17–18) In other words, Rozankowski did not limit his search of the
NLF files to only those files LoGrasso had set aside for the PSO investigators to
review, which LoGrasso had previously reviewed. (Id. at 17–18; 46:11-13)

Rozankowski created a binder that contained NLF documents from
evidence.com to support his report and his subpoena requests. (Dkt. 113 at 22:2-11)

This binder contained documents that were not saved in the "Files for Review" folder.
(Id.) The binder also contained copies of the emails he sent to the State Attorney's
office as well as copies of the subpoena requests. (Id. at 31:5-12)

Rozankowski left the PSO on March 11, 2022, (Id. at 18:16-17), and Gasparino
assumed responsibility for the NLF investigation by March 29, 2022. (Dkt. 112 at
61:25–62:2) Gasparino reviewed the documents the banks provided in response to
Rozankowski's subpoenas. (Id. at 40:11-17) Gasparino compiled and summarized the
information he found in the bank records, such as the names of potential victims, some
of whom were not ASPR victims. (Def. Ex. 24, 25, 26)

Gasparino worked with FBI Special Agent Nigel Lewis, who was a part of the
process for determining whether the case would be transferred to the FBI. Gasparino
shared the information he compiled with Lewis, including the identity of suspected
victims who were not ASPR victims. (Def. Ex. 26)

### d. The FBI's Investigation

The case was transferred to the FBI on April 22, 2022. (Dkt. 112 at 82:13-14)
Gasparino, in his capacity as a PSO investigator, became a Task Force Officer
("TFO") for the FBI's investigation into the suspected fraud by NLF. (Id. at 82) Lewis
was the lead agent for the FBI investigation. (Id. at 156:17-20)

The FBI received a copy of Rozankowski's report that identified twenty-one
potential victim clients, including some whom were not ASPR victims. (Def. Ex. 11)
Gasparino also gave Lewis four binders related to the investigation. (Dkt. 112 at 161–
62) One binder contained a transcript of the recording of the August 23, 2021 meeting

between LoGrasso and the PSO investigators. (Id. at 162:5-6) Lewis testified the documents in the other three binders were separated with labeled tabs, which indicated they contained subpoenaed bank records as well as other documents. (Id. at 162:7-14) Lewis was concerned the binders contained privileged information. (Id. at 163:9-18)

Lewis testified that Assistant U.S. Attorney ("AUSA") Jay Trezevant instructed him not to review NLF client files. (Id. at 172:8-20) Accordingly, Lewis testified he did not review everything in the binders and that he never reviewed NLF client files. (Id. at 162–66) Lewis did, however, review the transcript of LoGrasso's meeting with the PSO investigators and the subpoenaed bank records for ASPR. (Id. at 165–66, 170, 200, 204–05) From reviewing the ASPR bank records, he identified the ASPR victims as twelve potential victims. (Id. at 206:15-24)

On September 22, 2022, Lewis interviewed Berge at the U.S. Attorney's office in Tampa, Florida. (Id. at 210:10-19) After the interview, on November 15, 2022, Lewis received copies of Berge's closing statements, both the one NLF had faxed her and the one from the NLF Files LoGrasso had provided her. (Id. at 212–13)

At some time prior to November 1, 2022, the FBI created a taint team for the investigation. (Id. at 215) The purpose of the taint team was to review the NLF Files for non-privileged documents relevant to the investigation and to provide those documents to the investigative team.[5] (See id. at 194–95) However, the FBI first sought

---

[5] Initially, Special Agent Thuy Hibbitts was selected to be a member of the taint team. (Dkt. 112 at 217:8-12) Ultimately, however, Hibbitts never joined the taint team, and was made a member of the investigative team. (Id. at 217:17–218:2) She then succeeded Lewis as the lead FBI agent for the NLF investigation. (Id.)

to obtain copies of the NLF Files independent of the copies provided to it by the PSO
because the PSO had lost the thumb drive LoGrasso had given to the PSO in August
2021. (Id. at 174:9-14) Although the PSO maintained a copy of the NLF Files on
evidence.com, Lewis testified he believed "it was possibly commingled with other stuff
. . . ." (Id. at 217:1-7) So, the FBI decided to secure another copy of the NLF Files
from LoGrasso for the taint team to review. (Id.)

To obtain a copy of the NLF Files, the FBI sent a Computer Analysis Response
Team ("CART") to LoGrasso's home on December 13, 2022. (Id. at 106:19; 107–08;
110–11) The lead agent on the CART, Special Agent Michael Klepac, made a forensic
image the NLF Files on LoGrasso's desktop computer. (Id.) During his testimony at
the hearing, Klepac explained he did not obtain a logical image of LoGrasso's entire
computer because LoGrasso had only consented to their taking a forensic image of the
NLF Files. (Id. at 111) The forensic image shows that the copies of the NLF Files on
LoGrasso's desktop computer were first introduced to LoGrasso's desktop computer
on August 23, 2021, the day of LoGrasso's first meeting with law enforcement, at 4:46
p.m. UTC time, or 12:48 p.m. EDT time.[6] (Id. at 141–42; Def. Ex. 35; Dkt. 135-1 at
6) Even though this date and time would have made it obvious that these files were
not the files LoGrasso initially downloaded from NLF, the FBI did not take a forensic
copy of any other device of LoGrasso's. Klepac had no explanation for that decision.

Sometime between December 2022 and March 2023, Special Agent Thuy

---

[6] UTC time is Coordinated Universal time.

Hibbitts joined the investigative team. Lewis remained the lead agent for the NLF investigation. On one occasion, Lewis instructed Hibbitts to open one of Gasparino's binders and directed her to look at a bank record, which was filed with other bank records. (Dkt. 113 at 168–70) The bank records were separated from other documents in the binder with a labeled tab. (Id.) Hibbitts did not view any documents in the binder that were not bank records. (Id.) Otherwise, Hibbitts never reviewed anything in Gasparino's binders.

The taint team reviewed the CART copy of the NLF Files. (Dkt. 112 at 193–94) Lewis testified the taint team was directed to look only at documents related to the ASPR victims. (Id. at 218:20-25) In the beginning of March 2023, the taint team sent the investigative team non-privileged files they deemed pertinent to the investigation. (Id. at 219–20)

On March 31, 2023, Lewis sent an email to AUSA Trezevant explaining that he and Hibbitts wished to issue Federal Grand Jury subpoenas for the bank accounts they believed contained pertinent information. (Def. Ex. 12) He wrote: "We plan to issue subpoenas to Chase Bank and Sun Coast Federal CU for the subjects (bank and credit cards), and Chase Business Bank account for [LoGrasso], specifically for the business account he set up, [ASPR]." (Id.)

In April 2023, Hibbitts took over as the lead FBI investigator for the NLF investigation. (Dkt. 113 at 68) Hibbitts received eleven files of non-privileged client records from the taint team. (Id. at 69–70) These records were the records of eleven of the ASPR victims, P.S., A.C., F.D., F.C., E.B., E.C., B.H., G.M., R.M., M.N., and

R.S. (Id. at 71) The taint team did not provide Hibbitts a file of non-privileged records for Ed.C. because the list of ASPR victims Lewis compiled spelled Ed.C.'s name incorrectly. (Id. at 72:2-7; 74)

Hibbitts recreated the subpoenas originally sent by Rozankowski so that the FBI would have its own set of bank records. (Id. at 77) Additionally, Hibbitts served a subpoena directly to Defendant in June 2023. (Id. at 79; Gov't Ex. 7) The subpoena requested client records for the twelve ASPR victims, but Ed.C.'s name was again misspelled. (Id. at 74) Nonetheless, the FBI received non-privileged client records for all the ASPR victims from NLF in response to the subpoena, including records for Ed.C. (Dkt. 113 at 72) Thus, the FBI obtained non-privileged client records for each of the ASPR victims. Notably, these client records were identical to the records the taint team provided Hibbitts from LoGrasso's NLF Files.

On the same day that Hibbitts served a subpoena on Defendant, Hibbitts also interviewed B.H., one of the ASPR victims, and his wife. (Id.) B.H. and his wife told Hibbitts that they had received two settlement checks at the time of his NLF-facilitated settlement. (Id. at 80) Hibbitts testified that B.H. and his wife told her that sometime later, they received a check for additional settlement funds via FedEx. (Id.) The check was accompanied by a letter from NLF explaining that NLF had made an accounting error. (Id.)

On August 17, 2023, Hibbitts interviewed Mr. Nicoletti, who explained that, on the advice of her divorce attorney, Defendant refunded money to most of the clients from whom NLF received an overpayment. She did so by mailing them a check along

with a letter.[7] (Id. at 81) Hibbitts testified that Mr. Nicoletti explained that each victim-client's refund check was for the amount fraudulently diverted from the settlement, plus compounding interest. (Id.)

Based on this new information from B.H. and Mr. Nicoletti, Hibbitts requested a subpoena for relevant bank records from a larger time frame—January 1, 2020 to December 31, 2022. (Id. at 81) In response to this subpoena, on September 8, 2023, Hibbitts received copies of ten checks written from the NLF IOTA Trust Account to NLF clients. (Id. at 84–86; Gov't Ex. 9) Each check stated "additional settlement funds" in the memo line and was signed by Defendant. (Id.)

Two of the recipients of these refund checks were not among the alleged ASPR victims: J.B. and J.P. (Id. at 86–87, 89) AUSA Trezevant requested Defendant's counsel provide the Government with NLF's complete non-privileged records for J.B. and J.P. on September 17, 2023. (Gov't Ex. 10) Defendant's counsel provided these documents, and the closing statements for J.B. and J.P. were similar to Berge's closing statement. (Dkt. 113 at 95–96)

After the FBI received the documents for J.B. and J.P. from Defendant's counsel, the FBI requested records related to these clients from NLF's bank for the period from March to May 2017. (Id. at 95) In response, the FBI received a check from

---

[7] Hibbitts testified that Mr. Nicoletti explained the failure to refund some of the clients. Some clients had moved, so Defendant and Mr. Nicoletti did not know where to mail the refund check. (Dkt. 113 at 90) Mr. Nicoletti also explained that Berge and P.S. did not receive refund checks because Defendant and Mr. Nicoletti feared they would discover they had been victims of the alleged fraud, as Berge was an attorney and P.S.'s son was an attorney who had previously worked for NLF. (Id.) According to Mr. Nicoletti, they were designated "additional settlement funds" to conceal the alleged fraud from the non-lawyer clients.

NLF to LoGrasso for $9,350.00. (Gov't Ex. 6E) In the memo line, the check stated, "[J.B.] – Loan Paid Back." (Id.) The FBI associated another responsive check with J.P. (Dkt. 113 at 97:1-14; Gov't Ex. 6E) The check was written from NLF to LoGrasso on April 11, 2017 for "Loan, surgical." (Gov't Ex. 6E)

In December 2023, after consulting with AUSA Trezevant, Hibbitts instructed LoGrasso to delete any client files he still had on devices in his possession. (Dkt. 113 at 100–01) Hibbitts testified that the Government instructed LoGrasso to delete the client files from his devices because the files likely contained privileged, confidential, or otherwise sensitive information. (Id.) The Parties do not dispute that LoGrasso followed the Government's instruction and deleted the NLF Files in his possession. (Id. at 193)

### e.  The Thumb Drive

Just prior to the November 2024 hearings in this case, Rozankowski discovered the thumb drive LoGrasso gave him after the August 23, 2021 meeting. (Id. at 22:15-17) Rozankowski found the thumb drive in a box in his closet that contained other items he took with him when he left the PSO. (Id. at 22–23) Special Agent Klepac analyzed the thumb drive, and on December 2, 2024, the Court heard testimony from Klepac about his analysis.

Klepac determined that a folder on the thumb drive titled "Evidence" was created on the thumb drive on August 22, 2021, the day prior to the LoGrasso meeting

held at Kemp's office.[8] (Dkt. 116 at 15) The Evidence folder was last modified on
August 23, 2021 at 12:57 p.m., the day of the meeting in Kemp's office. (Id. at 16) The
Evidence folder contained two primary subfolders called "Case Files" and "Files for
Review." (Id. at 17)

The Case Files folder was created on that thumb drive on March 6, 2020. (Id.)
The Case Files folder had four subfolders—"Personal  Injury Cases A-Z - Attorney
Fee Lien;" "Personal Injury Case A-Z - Closed;" "Personal Injury Cases A-Z - In
Litigation with Mike Walker;" and "Personal Injury Cases A-Z – Opened"—which
were all created on the thumb drive on November 25, 2019 between 10:36 a.m. and
11:05 a.m. (Id. at 18:5-12)

The Files for Review folder on the thumb drive was created at 12:54 p.m. on
August 23, 2021, the day of the meeting in Kemp's office. (Gov't Ex. 20) The Files for
Review folder contained a subfolder called "Anesthesia Services of PR." (Id.) This
subfolder contained twelve subfolders—one for each of the ASPR victims. (Id.) The
Anesthesia Services of PR folder and each of its twelve subfolders were created on the
thumb drive on August 23, 2021 at 12:54 p.m. (Id.; Dkt. 116 at 22) Klepac testified
each ASPR client also had a subfolder in Personal Injury Case A-Z – Closed. (Dkt.
116 at 24) For example, Klepac testified, E.B.'s subfolder in the "Closed" folder
contained all the files in E.B.'s subfolder in the Anesthesia Services of PR folder, plus

---

[8] When Klepac referred to the date and time a folder was "created," Klepac meant the date and time
the folder was either created for the first time on the thumb drive or moved or copied to the thumb
drive. (Dkt. 116 at 25:20-24)

some additional files. (<u>Id.</u>; <u>see</u> Gov't Ex. 20 at 7–8)

## II.    ANALYSIS

In her motions and supplemental memoranda, Defendant requests this Court dismiss the Indictment because Defendant asserts the Government has caused exculpatory evidence to be lost or destroyed. Additionally, Defendant argues this case should be dismissed or the Government's counsel should be disqualified because the Government failed to notify Defendant that it had come into possession of her clients' confidential information and investigators and counsel for the Government were potentially exposed to documents protected by Defendant's clients' attorney-client privilege. Finally, Defendant requests this Court suppress evidence the Government obtained as a result of LoGrasso sharing NLF clients' legal documents, like their settlement statements, because Defendant argues this evidence resulted from searches that violated Defendant's Fourth Amendment rights.

The Court finds that each of Defendant's motions is due to be denied.

### a. Defendant's Motion to Dismiss the Indictment for Loss or Destruction of Exculpatory Evidence

The Court finds Defendant's Motion to Dismiss for Loss of Exculpatory Evidence is due to be denied. This motion is based on the Government's failure to locate the thumb drive LoGrasso gave to the PSO on August 23, 2021. (Dkt. 67) Defendant argued that without the metadata on the thumb drive, it was impossible to know when LoGrasso downloaded the NLF Files, a fact relevant to the question of whether LoGrasso did so at the direction of law enforcement. (<u>Id.</u> at 6) However,

Rozankowski located the thumb drive just prior to the November 2024 hearings in this case, so the evidence on the thumb drive is no longer lost. In Defendant's supplemental memorandum in support of her Motion to Dismiss for Loss of Exculpatory Evidence, Defendant raises new allegations about the Government's failure to preserve evidence in this case, and requests that the Court dismiss the Indictment on those grounds, which are set forth below.

### i. The Originally Downloaded NLF Files

Defendant's expert, Carter Conrad, Jr., opines that a forensic analysis of the thumb drive LoGrasso gave to the PSO reveals that the thumb drive once had a folder called "Dropbox" that is now deleted. (Dkt. 125-1 at 1) Conrad attests that the thumb drive "contained multiple deleted file directories[,]" and "that files were introduced to the [thumb drive] using 'Dropbox.'" (Id.) "Dropbox is a commercially available cloud repository that utilizes a sync engine to synchronize files and folders . . . across multiple devices and network locations." (Id.) "With synchronization, it is possible that files and file folders can retain their associated metadata from the date they were created on the source network rather than the date they were introduced to a specific device." (Id.) Conrad opines that, "[b]ecause of this, without source information from the host device for comparison, I don't believe the date[] shown in the file properties menu is the definitive date that the files or file[] folders were first introduced to the thumb drive." (Id.) In short, Defendant relies on Conrad's opinion to argue that the Court should not rely on the creation dates associated with folders on LoGrasso's thumb

drive as evidence of when LoGrasso downloaded or accessed the NLF Files. (See Gov't Ex. 20)

However, Conrad notes, "There are various versions of Dropbox software, including web-based and desktop variants, each affecting metadata differently." (Dkt. 125-1 at 1) Conrad does not opine that he knows which variant LoGrasso used or that there is any evidence that LoGrasso's Dropbox was synchronized with NLF's network.

Based on Conrad's opinion and Defendant's own observations, Defendant argues it is "feasible that Mr. LoGrasso set up or had access to a Dropbox account that was syncing with the NLF network, even after his termination from the firm." (Id. at 11) If this were true, Defendant asserts LoGrasso could potentially "access, modify, and delete files at his discretion, and likely without the knowledge of the NLF." (Id.) Defendant maintains, however, that because LoGrasso deleted the NLF Files from his personal devices at the Government's direction, the source information for the NLF Files is lost. (Id.) Consequently, Defendant notes it is impossible to know whether LoGrasso used Dropbox to download the NLF Files.[9]

Defendant further argues that if LoGrasso had synchronous access to NLF's network, it is possible he altered and deleted documents that proved Defendant was

---

[9] The Court does not address Defendant's argument to the extent it is based on the assertion that the NLF Files on LoGrasso's personal desktop computer, which the FBI copied in December 2022, had a creation time of 4:48 p.m. on August 23, 2021. The Government provides an expert opinion that the created date for the NLF Files on LoGrasso's desktop was 4:48 p.m. UTC time, not EDT time. (Dkt. 135 at 3; Dkt. 135-1 at 6) Translated to EDT time, the NLF Files on LoGrasso's desktop were created at 12:48 p.m. on August 23, 2021. (Id.)

not involved in the ASPR scheme. (Id. at 13) The forensic analysis of the thumb drive shows LoGrasso once had coding tutorials saved, and Defendant speculates that these tutorials could have taught LoGrasso how to alter metadata on files, such as their author and their creation, modification, and access dates. (Id.) However, Defendant argues this potential evidence of Defendant's innocence has been destroyed because the Government directed LoGrasso to delete these files from his computer. (Id.) Thus, Defendant requests the Court dismiss the Indictment for the Government's destruction of exculpatory evidence.

### ii.  The Audio Dropout

In her supplemental memorandum, Defendant also calls into question the transcript of LoGrasso's meeting the PSO, which transcribes an audio recording. (Dkt. 125 at 14) The transcript reflects this exchange between Kemp and LoGrasso:

> [KEMP]: Now how do they know which ones they need to look at?
> [LOGRASSO]: [22:41] Oh, because I have those separated. [NO AUDIO FROM 22:44 TO 22:48] I spent hours doing it for you.

(Gov't Ex. 1-T) In the audio recording, after Kemp asks her question and LoGrasso replies, "Oh, because I have those separated[,]" there are 4.3 seconds of silence before LoGrasso completes his response. (Gov't Ex. 1) Defendant presents expert testimony that the transcribed audio recording is a copy of an original. (Dkt. 124-1) Defendant's expert opines the audio dropout "is consistent with the original recording being post processed in an audio editing program, by erasing and replacing the original

- 23 -

information with a no-amplitude recording." (Id. at 2) "It is possible that this editing

process may have deleted and replaced more than 4.36 seconds." (Id.)

Based on this expert opinion, Defendant posits that LoGrasso's reply that he

"spent hours" organizing the NLF Files for law enforcement is unreliable and cannot

support a finding that LoGrasso reviewed the ASPR files before the meeting with law

enforcement. (Dkt. 125 at 14) Specifically, Defendant contends that the following

scenarios could have occurred:

> 1) one or more persons present at that meeting affirm that
> Mr. LoGrasso was acting at the direction of the State
> Attorney in order to gain immunity; 2) an admission by Mr.
> LoGrasso that he had created and/or altered all of the
> ASPR documents and therefore knew exactly what PSO
> needed to look at because he was the perpetrator and had
> first-hand knowledge (this is exculpatory because,
> according to the Indictment, the Government alleges that
> Ms. Nicoletti participated in creating the false ASPR closing
> statements); 3) both situations [described in 1) and 2)]
> occurred; or 4) that he admitted to having continuous access
> to the NLF network via Dropbox or other means, and that
> he retained the ability to alter documents.

(Id.) Defendant asserts,

> LoGrasso could have made other statements that law
> enforcement may have wanted to erase, such as admitting
> that he pulled out the documents that they instructed him
> to pull, or stating that he had not separated out any specific
> documents and was waiting for their instruction as to what
> they wanted to see, or that he had edited the documents to
> provide the proof that law enforcement was seeking.

(Id. at 15) Defendant suggests the PSO had an incentive to create a case against

Defendant, rather than one only against her husband or against her husband and

LoGrasso. (Id.) "If the already-immunized witness admitted that he was the

perpetrator of the scheme, or that only he and the office manager, [Defendant's] husband, were the only ones involved in the scheme, it likely would have been a much smaller case and likely would not have gone federal." (Id.)

The Government admits that the audio recording available to the Parties is a copy of the original, which has been destroyed. Defendant argues that her inability to analyze the original audio recording prevents her proving that the original audio was edited to delete more than 4.36 seconds, and thus prevents her from obtaining potentially exculpatory evidence. On this basis, Defendant requests the Court dismiss the Indictment for the Government's destruction of exculpatory evidence.

### iii.   The Government's Response

The Government responds to Defendant's new allegations by noting that Defendant does not establish the constitutional materiality of either the originally downloaded NLF Files or the audio recording. The Government argues Defendant fails to establish that the lost or destroyed evidence "(1) 'possess[ed] an exculpatory value that was apparent before [it] was destroyed' and (2) is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" (Dkt. 133 at 10) (quoting California v. Trombetta, 467 U.S. 479, 489 (1984)) The Government notes that the loss or destruction of "'potentially' useful evidence" does not constitute the denial of due process unless the defendant can show that the government acted in bad faith. (Id. at 11) The Government argues Defendant fails to establish bad faith in either instance.

First, the Government argues its instruction to LoGrasso to delete the NLF

Files on his personal devices was motivated by a concern for the confidentiality of the NLF clients' sensitive information, and there is no evidence it was motivated by animus towards Defendant. As for the audio dropout, the Government provides a persuasive and thorough expert opinion from Ovie Carroll, the Director of the Department of Justice's Cybercrime Lab, that undermines the speculations of Defendant's expert. (Dkt. 113-1) Carroll uses the timestamps from the recording's metadata to show it is unlikely that any audio other than the 4.36-second dropout was deleted from the recording, and opines that it is unlikely the dropout resulted from the use of an editing program. (Id.)

### iv.  Applicable Law

The Due Process Clause of the Fourteenth Amendment requires the government disclose favorable evidence in its possession or control that is material to the guilt of a criminal defendant. Davis v. Sellers, 940 F.3d 1175, 1186–87 (11th Cir. 2019). "When the State suppresses or fails to disclose material exculpatory evidence, a due process violation results, and the question of bad faith is irrelevant." Id. at 1187 (citing Illinois v. Fisher, 540 U.S. 544, 548 (2004)). "'To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" Id. (quoting Trombetta, 467 U.S. at 489). Comparable evidence includes the testimony and cross-examination of witnesses with knowledge of the destroyed evidence. Trombetta, 467 U.S. at 490.

If the evidence is only "potentially useful," rather than constitutionally material, the failure to preserve that evidence does not violate the Due Process Clause unless a criminal defendant shows bad faith on the part of the police. Davis, 940 F.3d at 1187 (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)) (citing Fisher, 540 U.S. at 547–48). Evidence is only "potentially useful" if it is evidence about "which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57. Whether the police acted in bad faith depends on their "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56 n.1. Negligence is insufficient to establish bad faith. Id. at 58.

Evidence with an immediately apparent exculpatory value includes evidence that would establish another person committed the crime of which the defendant is accused. See Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the evidence with immediately apparent exculpatory value was the confession of Brady's accomplice that he committed the murder during a robbery that resulted in a person's death, not Brady. Id. at 84–88. As an example of potentially useful evidence, in Trombetta, the Supreme Court found that the original breath samples taken during DUI stops, which were not preserved pursuant to law enforcement's policy, did not have immediately apparent exculpatory value. 467 U.S. at 489–91. The defendants argued they could have used the breath samples to prove the incriminating results of breathalyzer tests were inaccurate, establishing their innocence. Id. This evidence was only potentially useful because it was evidence about "which no more [could] be said than that it could have

- 27 -

been subjected to tests, the results of which might have exonerated the defendant."

Youngblood, 488 U.S. at 57.

> ### v. The Lost or Destroyed Evidence Identified by Defendant is Potentially Useful Evidence, Not Constitutionally Material Evidence

Defendant fails to establish that either the originally downloaded NLF Files or the original audio recording were constitutionally material. Neither piece of evidence had apparent exculpatory value before the evidence was lost or destroyed. Defendant asserts the originally downloaded NLF Files *could have* contained metadata that *might* prove LoGrasso had synchronous remote access to the NLF network and that he used that access to modify NLF documents to erase evidence of Defendant's innocence. This possible value of the originally downloaded files means that the evidence was merely potentially useful evidence. As for the original audio recording, Defendant maintains that an analysis of the original recording *could* reveal that the recording was edited to delete substantial portions of the audio and that those portions *could have proved* Defendant's innocence. Again, this possibility is insufficient to establish that the original audio recording had apparent exculpatory value before it was lost or destroyed. Defendant fails to establish the first prong of constitutional materiality.

Because Defendant fails to establish the evidence had any immediately apparent exculpatory value, the Court concludes it need not analyze whether Defendant could obtain comparable evidence by other reasonably available means. Defendant does not know what the evidence would show if it were analyzed or if it would be exculpatory. Thus, the Court could only determine what evidence would be "comparable" by

making assumptions and hypothesizing. The Court declines to do so.

Defendant fails to establish the first, necessary prong of the evidence's constitutional materiality. The evidence is merely potentially useful evidence. Thus, the Court must determine whether Defendant establishes the Government acted in bad faith when it lost and/or destroyed or directed the destruction of the potentially useful evidence.

### vi. Defendant Fails to Show the Government Acted in Bad Faith

The record does not support a finding that the Government acted in bad faith when it directed LoGrasso to delete the NLF Files from his personal devices or when it lost the original audio recording. Based on Hibbitts's testimony, the deletion of the originally downloaded NLF Files was the result of negligence by the FBI, not bad faith. Lewis, Hibbitts, and the CART agents failed to consider that LoGrasso maintained copies of the NLF Files on multiple devices and that his desktop may not have been the device onto which he originally copied the files after downloading them from NLF's network. Thus, the FBI preserved only one copy of LoGrasso's NLF Files, and it appears from their metadata that they were not the NLF Files originally downloaded from NLF's network. When Hibbitts instructed LoGrasso to delete any copies of the NLF Files still in his possession, she did so believing the FBI had a copy of the only files in LoGrasso's possession. This belief was ill-founded, but only negligently so. Indeed, the oversight and the resulting instruction to destroy evidence may rise to the level of gross negligence, but it does not rise to the level of bad faith. Defendant points to no evidence that the Government directed LoGrasso to delete the

NLF Files in his possession to prevent Defendant from obtaining evidence of her innocence.

Importantly, also, the documents NLF provided to the Government in response to a subpoena were identical to the files the taint team culled from LoGrasso's NLF Files. This fact undermines Defendant's speculation that LoGrasso manipulated NLF documents to conceal evidence of Defendant's innocence. If NLF documents had been manipulated, Defendant had an opportunity to raise this alleged, speculated fraud by LoGrasso at the time she responded to the subpoena. Presumably, she would have reviewed the files, detected discrepancies that *could have been* surreptitiously added by LoGrasso. She did not, suggesting that the documents appeared as she believed they should.

Likewise, Defendant produces no evidence that the failure to preserve the original audio recording is the result of law enforcement's bad faith. It appears the original audio recording was deleted pursuant to the PSO's standard protocol. The Government represents that Rozankowski recorded the August 23, 2021 meeting on his PSO-issued Samsung cell phone. (Dkt. 120) The next morning, Rozankowski uploaded the recording to evidence.com. (Id.) The recording saved on evidence.com is the audio recording relied upon the Parties in this case. (Id.) Later, the Government indicates the recording on Rozankowski's PSO-issued Samsung cell phone was deleted when the PSO applied a factory reset to his work-issued phone so that it could be used by other employees, pursuant to the PSO's standard practice. (Id.) Defendant provides

Case 8:23-cr-00475-MSS-AEP    Document 150    Filed 06/23/25    Page 31 of 47 PageID
1879

no evidence that the original recording was deleted in a bad-faith attempt to prevent Defendant from discovering exculpatory evidence.

Defendant fails to establish that the loss or destruction of the originally downloaded NLF Files or the original audio recording warrants any remedy in this case. The Motion to Dismiss the Indictment for Loss or Destruction of Exculpatory Evidence is **DENIED**.

### b. Defendant's Motion to Disqualify Counsel for the Government

The Court finds Defendant's Motion to Disqualify Counsel for the Government is due to be denied. In Defendant's Motion to Disqualify, Defendant requested the Court disqualify from participation in these proceedings any employee of the U.S. Attorney's Office and any witnesses who were exposed to stolen, confidential, and privileged legal documents from NLF. (Dkt. 66 at 1) Defendant argued that Kemp, Berge, and the U.S Attorney's Office failed to comply with the Rules Regulating the Florida Bar (the "Rules") related to confidentiality. (Id. at 10–11) Specifically, Defendant pointed to Rule 4-1.6, which prohibits an attorney's disclosure of his or her client's confidential information except in certain circumstances. (Id. at 8) Defendant cited an opinion from the Florida Bar Ethics Committee as well as Castellano v. Winthrop, 27 So. 3d 134, 137 (Fla. 5th DCA 2010), to support the proposition that the Government's receipt, review, and use of the confidential information LoGrasso provided investigators violated the Rules. (Id. at 9) Defendant also cited civil cases in which courts disqualified attorneys who received and reviewed privileged or confidential information of the opposing party related to the subject of the parties'

litigation to protect against the possibility that the attorneys gained an unfair advantage in that litigation. (<u>Id.</u> at 16–19) <u>Gen. Accident Ins. Co. v. Borg-Warner Acceptance Corp.</u>, 483 So. 2d 505 (Fla. 4th DCA 1986); <u>Abamar Hous. & Dev., Inc. v. Lisa Daly Lady Décor, Inc.</u>, 724 So. 2d 572 (Fla. 3d DCA 1998). Defendant further argued that the investigative team was tainted by its exposure to privileged information and contended that members of the investigative team reviewed privileged items before the involvement of the taint team. (<u>Id.</u> at 14–15) Defendant asserted that disqualification or dismissal are appropriate remedies for the Government's violation of the privilege and the Rules about confidentiality.

In response, the Government noted that under relevant case law, disqualification of an attorney is an extraordinary measure that should be used sparingly. (Dkt. 74 at 9) The Government asserted that no one on the FBI investigative team was exposed to any privileged attorney-client communications or work product related to NLF's representation of the victim-clients. (<u>Id.</u> at 11) The Government also asserted that in discovery, the Government provided Defendant with a complete set of materials the investigative team received from the taint team. (<u>Id.</u>) Defendant never identified any privileged documents in the materials used by the investigative team. (<u>Id.</u>) Furthermore, the Government argued Rule 4-1.6 and the related case law did not impose any requirements on the Government with respect to Defendant's *clients'* confidential information. (<u>Id.</u> at 12–13, 15) Most notably, the Government noted that none of the victim-clients' information secured during the investigation will be used in any proceeding against the victim-clients. (<u>Id.</u> at 21)

Defendant did not file a supplemental memorandum in support of her Motion to Disqualify. (See Dkt. 134 at 1 n.1)

Defendant provides no basis to disqualify the U.S. Attorney's Office from this prosecution. First, to the extent Defendant believes disqualification is appropriate because the Government has been exposed to privileged documents, the attorney-client privilege protecting the victim-clients' information belongs to the victim-clients, not to Defendant. Knox v. Roper Pump Co., 957 F.3d 1237, 1248 (11th Cir. 2020) (citations omitted) ("[T]he attorney-client privilege protects disclosures made by a client to his attorney, in confidence, for the purpose of securing legal advice or assistance. The attorney-client privilege 'belongs solely to the client . . . .'"). Defendant may not invoke that privilege to shield herself from criminal liability for fraud she allegedly committed against her clients. Notably, no victim-client has objected to the Government's review and use of his or her information in this prosecution on the basis of the attorney-client privilege.

Likewise, the case law on an attorney's ethical obligation when he or she improperly receives confidential information does not demand disqualification in this case.

> [W]hen an attorney receives confidential documents he or she knows or reasonably should know were wrongfully obtained by his client, he or she is ethically obligated to advise the client that the materials cannot be retained, reviewed, or used without first informing the opposing party that the attorney and/or client have the documents at issue.

Castellano, 27 So. 3d at 137. The disqualification of an attorney who fails to comply

- 33 -

with these ethical obligations is appropriate where the attorney's client obtains or could obtain an advantage in litigation by the attorney's receipt and review of confidential documents belonging to the opposing party. <u>Gen. Accident Ins. Co.</u>, 483 So. 2d at 506; <u>Abamar Housing & Dev., Inc.</u>, 724 So. 2d at 573 ("The receipt of privileged documents is grounds for disqualification of the attorney receiving the documents based on the unfair tactical advantage such disclosure provides.").

Defendant improperly conflates the relationship between Kemp and LoGrasso with that of the Government and LoGrasso. LoGrasso was Kemp's client—though she refused to acknowledge that fact. LoGrasso brought her the NLF Files he had surreptitiously downloaded from the NLF server. Knowing this, she reviewed the documents and allowed her client to further breach the privilege of the NLF clients by disclosing their documents to the State Attorney so her client could gain a personal benefit—immunity. Perhaps this is something she should not have done, or perhaps she was justified in light of the claim that a fraud was being perpetrated on the NLF clients. But her actions are not those of the U.S. Attorney's Office, and her client, LoGrasso, was not acting at the direction of the Government. The Court need not decide in this proceeding whether Kemp violated the Rules by receiving, reviewing and disseminating documents she knew were improperly or illegally obtained by LoGrasso. Even if Kemp breached her ethical obligations, the breach is not imputed to the Government.

Moreover, the confidential information the Government ultimately received was not Defendant's confidential information, and the confidential information did

not relate to Defendant's representation in this prosecution because the prosecution
had not begun. The Court is also not persuaded that the prosecution's receipt of
evidence of a crime from a state law enforcement agency constitutes an improper
receipt of evidence. Additionally, the Court is not persuaded that the Government's
receipt of such information granted it an unfair tactical advantage in this prosecution.

The Court finds that the Government did not violate any ethical obligation by
failing to notify Defendant that LoGrasso had provided investigators with evidence of
her fraud before initiating these proceedings. The case law Defendant cites does not
support such an outcome. This is so even though it would have been more forthcoming
and more professional to have made these disclosures. Defendant's Motion to
Disqualify, (Dkt. 66), is due to be **DENIED**.

### c. Defendant's Motion to Suppress Under the Fourth Amendment

#### i. The Parties' Arguments

In her Motion to Suppress, Defendant argued that LoGrasso acted at the State
Attorney's direction; thus, LoGrasso's search violated the Fourth Amendment. (Dkt.
65 at 9) Defendant also argued that, even if LoGrasso's searches were private searches,
later searches of the NLF Files by the PSO, the FBI, and the taint team exceeded the
scope of any of LoGrasso's searches, so these extended searches violated the Fourth
Amendment. (Id. at 14–15, 19–21) Next, Defendant argued the Government failed to

adhere to the dictates of case law that reserves the authority to review records seized from a law firm for privilege for the judiciary.[10] (Id. at 17)

The Government responded that LoGrasso acted as a private individual when he downloaded the NLF Files before he left NLF's employ and that no government official was involved in LoGrasso's decision to do so. (Dkt. 91 at 17–18) The Government further argued that LoGrasso's subsequent searches of the NLF Files did not violate the Fourth Amendment because the Defendant has not shown that he conducted those searches at the direction of any government official. (Id. at 20–21) The Government maintained that any subsequent review of the NLF Files by law enforcement did not violate the Fourth Amendment because the scope of law enforcement's searches did not exceed the scope of LoGrasso's searches. (Id.) Finally, the Government argued that if the Court determined that Defendant's Fourth Amendment rights were violated, the independent source doctrine permits the admission of the resulting evidence. (Id. at 22–23) The Government asserted that its lawful receipt of the relevant files from NLF in response to a subpoena serves as an independent source for the evidence because the Government could have issued the subpoena based only on the ASPR checks, LoGrasso's testimony, and the subpoenaed bank records of ASPR and NLF. (Id. at 24)

In her supplemental memorandum regarding the Motion to Suppress, Defendant argues LoGrasso searched the NLF Files at the direction of Bartlett, the

---

[10] The Court does not discuss this argument by Defendant because, as discussed *supra*, none of the files were protected by a privilege belonging to Defendant.

State Attorney, and thereby acted as an agent of the government. (Dkt. 124 at 4) Defendant asserts that the evidence produced at the hearing does not establish that LoGrasso downloaded the NLF Files prior to his meeting with Kemp.[11] (Id. at 6–8) Defendant contends "[i]t is possible that LoGrasso set up a Dropbox account to automatically sync to the NLF server," giving LoGrasso "contemporaneous access to all NLF files" and allowing him to "download, modify, and delete files from the NLF server, even after his termination in February 2020." (Id. at 8)

In her supplemental memorandum, Defendant also calls into question the transcript of LoGrasso's meeting with the PSO. (Dkt. 124 at 12) Defendant posits that LoGrasso's reply that he "spent hours" organizing the NLF Files for law enforcement in advance of the meeting is unreliable and cannot support a finding that LoGrasso reviewed the ASPR files before the meeting with law enforcement. (Dkt. 124 at 13)

In the Government's response to Defendant's supplement, the Government argues that several facts support finding that LoGrasso downloaded and searched the NLF Files prior to Bartlett's promise of immunity and prior to the meeting with law enforcement. The Government notes that LoGrasso, Kemp, and Rozankowski testified that LoGrasso brought the thumb drive with the "Files for Review" folder, containing subfolders for each of the ASPR victims, to the meeting at Kemp's office. (Dkt. 135 at 4) Rozankowski testified that LoGrasso and Kemp accessed the folder

---

[11] Again, the Court does not address Defendant's argument to the extent it is based on the assertion that the NLF Files on LoGrasso's personal desktop computer, which the FBI copied in December 2022, had a creation time of 4:48 p.m. on August 23, 2021. See supra note 9.

and projected documents from an ASPR victim's subfolder. (Id.) The recording of the
meeting substantiates this testimony. (Gov't Ex. 1) The Government argues this
evidence that the thumb drive was organized prior to the meeting with law
enforcement shows that LoGrasso searched the NLF Files before the meeting. (Dkt.
135 at 4–5) The Government also notes that LoGrasso helped Berge determine
whether she had been a victim of fraud sometime before March 2021 when NLF faxed
Berge a copy of her closing statement in response to Berge's request. (Id. at 5) The
Government argues that in assisting Berge, LoGrasso necessarily searched through the
NLF Files before the meeting with law enforcement. (Id.) The Government also argues
that Klepac's analysis of the thumb drive supports LoGrasso's testimony about how
he organized the folders and when. (Id. at 4) (citing Dkt. 116 at 23–26))

    In response to Defendant's contention that LoGrasso could not have reviewed
the NLF Files until after August 23, 2021 because they were not created on his desktop
until that date, the Government notes that LoGrasso testified he also stored the NLF
Files on his laptop computer. (Dkt. 135 at 5–6) The Government argues the fact that
he never copied them to his desktop until August 23, 2021 does not prove he never
reviewed them prior to that date. (Id. at 6)

    The Government also argues that no evidence supports Defendant's
speculations about LoGrasso's remote access to the NLF network and the audio
dropout. (Id. at 6–9) The Government provides expert testimony to this effect. (Dkt.
133-1; Dkt. 135-1) In particular, the Government provides the opinion of FBI CART
Special Agent William Tidwell, in which Tidwell states: "The deleted Dropbox folder

only indicates the existence of a folder named 'Dropbox.' It does not provide evidence of remote access to NLF servers or files." (Dkt. 135-1 at 4) Tidwell explains that it is unlikely LoGrasso "would have the technical expertise to accomplish this type of remote attack without leaving evidence . . . on a Dropbox application at the NLF and/or on the NLF systems and servers." (Id.) "To suggest that Mr. LoGrasso could accomplish this type of remote access, data manipulation, and data exfiltration, all without leaving any evidence of such activity, greatly ignores the complexity and technical abilities required to accomplish this." (Id.) As for the audio dropout, the Government provides Carroll's expert opinion, in which he analyzes the timestamps from the recording's metadata to show it is unlikely that any audio other than the 4.36-second dropout was deleted from the recording. (Dkt. 133-1)

Finally, the Government renews its argument that the Court may apply the independent source doctrine to admit the evidence obtained in this case. (Dkt. 135 at 9–10)

In its supplemental memorandum regarding the Motion to Suppress, the Government reiterates the arguments discussed in its response to Defendant's supplemental memorandum. (Dkt. 123) In response to the Government's supplement, Defendant argues that the Government relies heavily on LoGrasso's testimony and asserts that LoGrasso's testimony is unreliable and refuted by the record evidence. (Dkt. 134 at 4) Defendant argues the evidence shows LoGrasso did not first access or organize any of the NLF files until August 22, 2021, after he met with Kemp. (Id. at 5) Defendant also notes that Gasparino was exposed to the NLF Files from the

beginning of the investigation and carried "tainted" information with him throughout the FBI investigation. (Id. at 8) Finally, Defendant argues that the Court should not apply the standard for the independent source doctrine articulated in United States v. Noriega, 117 F.3d 1206 (11th Cir. 1997), because, unlike in Noriega, here, law enforcement never obtained a search warrant. (Id. at 9)

### ii. *Applicable Law*

The Fourth Amendment's protections do not apply to a search or seizure by "a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 113 (1984). "For a private person to be considered an agent of the government, we look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003).

If a private search occurs, the Government's subsequent "invasive conduct" does not violate the Fourth Amendment if it does not exceed the scope of the private search. Jacobsen, 466 U.S. at 115; United States v. Sparks, 806 F.3d 1323, 1334 (11th Cir. 2015), *overruled on other grounds by* United States v. Ross, 963 F.3d 1056 (11th Cir. 2020), ("[A] warrantless law-enforcement search conducted after a private search violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search.").

A defendant bears the burden of establishing that the Fourth Amendment was

violated. United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998). A defendant also bears the burden of establishing that a private person acted as an agent of the Government to argue a private search violated the Fourth Amendment. United States v. Allen, No. 18-cr-526, 2019 WL 5842684, at *7 (M.D. Fla. Oct. 7, 2019).

### iii.  LoGrasso's Searches Were Private Searches

LoGrasso's searches did not violate the Fourth Amendment because there is no evidence that a government official "knew of or acquiesced in" LoGrasso's initial intrusive conduct. Steiger, 318 F.3d at 1045. Cf. United States v. Knoll, 16 F.3d 1313, 1317–21 (2d Cir. 1994) (finding that the private theft of files from a law office did not violate the Fourth Amendment, but that subsequent searches through those files by private actors could violate the Fourth Amendment if those subsequent searches were "tacitly suggested and condoned" by government actors).

Defendant provides no evidence that persuades the Court that LoGrasso did not download the NLF Files onto a thumb drive before he left NLF's employment, per his testimony. Defendant speculates that LoGrasso may have used a Dropbox to synchronize with the NLF network after he left NLF's employment and relies on general statements by Defendant's expert to support the speculation. However, Defendant provides no evidence that the deleted Dropbox folder created remote access to NLF servers or files. (Dkt. 135-1 at 4) The Court finds, therefore, that LoGrasso downloaded the NLF Files prior to leaving NLF's employ. In any event, Defendant provides no evidence that a government official directed LoGrasso to download the NLF Files to his personal device or devices or to create shadow access to the NLF

network via Dropbox. Thus, the Court finds that Defendant has failed to show that a government official "knew of or acquiesced in" LoGrasso's downloading of the NLF Files to a personal device. Steiger, 318 F.3d at 1045. The Court concludes this seizure was private action.

Next, there is no evidence in the record that Bartlett knew LoGrasso had wrongfully downloaded and kept the NLF Files in violation of a confidentiality or non-disclosure agreement.[12] There is no evidence Bartlett directed LoGrasso to download files he had not already downloaded. Likewise, there is no evidence that Bartlett directed LoGrasso to open and review files that LoGrasso had never opened before to obtain information Bartlett believed would support a prosecution of Defendant. In a brief conversation with Bartlett, Kemp relayed LoGrasso's allegations about NLF and Defendant and told Bartlett that LoGrasso claimed to have documentation. (Dkt. 111 at 223:12-15; 229:1-9) Bartlett told Kemp that if LoGrasso cooperated, he would be considered a witness in any resulting investigation and would not be prosecuted. (Id. at 226:24–227:1) Other than Kemp telling LoGrasso to bring "everything" they had discussed to the meeting that was being planned, the record evidence does not establish anyone instructed LoGrasso to do anything to prepare for his meeting with law enforcement. (Id. at 142–43; 251:11-15) Based on this unrefuted testimony, the Court finds that Bartlett did not direct LoGrasso to conduct any

---

[12] In any event, to the extent Defendant asserts the Government should have declined to accept documentation of Defendant's fraud from LoGrasso because of the non-disclosure and confidentiality agreements, these agreements, if relied upon for that purpose, were likely void as against public policy. See Griffin v. ARX Holding Corp., 208 So. 3d 164, 170 (Fla. 2d DCA 2016).

searches of the NLF Files.

The Court finds LoGrasso's searches of the NLF Files were private conduct. For this reason, the searches did not violate the Fourth Amendment.

### iv. Independent Source Doctrine

The independent source doctrine nonetheless supports the admission of evidence about the fraud perpetrated against the ASPR victims, Berge, J.B., and J.P.

"In the event the government violates the Fourth Amendment in conducting an illegal search, '[t]he independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation.'" United States v. Barron-Soto, 820 F.3d 409, 415 (11th Cir. 2016). The Eleventh Circuit uses a two-step process to determine whether the independent source doctrine renders evidence admissible. Noriega, 676 F.3d at 1260.[13] First, any information gained during an arguably illegal Fourth Amendment search is excised from consideration. Second, the non-excised information is considered to determine whether that information would have served as an independent source and led the government to the same investigative step or steps, resulting in discovery of the evidence. Id. at 1260–1261 ("If the remaining or non-excised information is enough to support a probable cause finding, the second thing we do is determine whether the officer's decision to seek the

---

[13] The Court applies the standard the Eleventh Circuit articulated in Noriega over Defendant's objection. Defendant provides no case law providing a different standard for the application of the independent source doctrine in cases in which the government relies upon a subpoena, rather than a search warrant, as an independent source. The Court also believes the two circumstances are easily analogized and finds Noriega's reasoning persuasive here.

warrant was 'prompted by' what he had seen during the arguably illegal entry."); see
also, e.g., Harling, 705 F. App'x at 917.

In the context of an officer requesting a search warrant after conducting a
warrantless search, the Eleventh Circuit has stated: "To determine whether an officer's
decision to seek a warrant is prompted by what he saw during the initial entry, courts
ask whether the officer would have sought the warrant even if he had not entered."
Noriega, 676 F.3d at 1260–61. "If the officer would have done so, his decision to seek
the search warrant is supported by an 'independent source,' and the evidence seized
under the warrant is admissible regardless of whether the initial entry violated the
Fourth Amendment." Id. at 1261.

The Government bears the burden to show the independent source doctrine
applies by the preponderance of the evidence. United States v. Byrd, 765 F.2d 1524,
1528–29 (11th Cir. 1985).

Here, the information that must be excised is the all the information
Rozankowski obtained during his searches of the NLF Files on evidence.com.[14] The
remaining, relevant information is LoGrasso's and Berge's statements to law
enforcement officers, Berge's closing statements, the ASPR checks, and the ASPR
articles of incorporation. The question the Court must decide is whether the PSO and
FBI investigators would have sent subpoenas to the NLF and ASPR banks even if they
only ever knew about this non-excised information. In other words, the Court must

_____

[14] The Court notes there is no evidence that any FBI investigator conducted a search of the NLF Files.

decide whether the investigators would have sent these subpoenas even if they never knew about the additional victims of fraud and the suspected Stacy Carlton loan scheme discovered by Rozankowski.

At the end of LoGrasso's meeting with law enforcement, before Rozankowski searched the NLF Files on evidence.com, Rozankowski stated, "We can start to send out some subpoenas for Chase and Center State . . . ." (Gov't Ex. 1-T) These were two of the banks identified on the ASPR checks. (Gov't Ex. 2) The third was Jefferson Bank.[15] (Id.) Based only on the information LoGrasso provided at the meeting, the PSO investigators had their next investigative steps in mind. Within a couple of days, Rozankowski submitted his subpoena requests to the banks maintaining ASPR's and NLF's accounts.

Rozankowski and Gasparino were aware of victim-clients other than the ASPR victims. But once the investigation transferred to the FBI, the FBI focused solely on obtaining evidence of the fraud against the ASPR victims. Lewis never reviewed the NLF Files contained in Rozankowski's binders. (Dkt. 112 at 162–66) Instead, he reviewed the subpoenaed bank records for ASPR, which allowed him to identify the ASPR victims as twelve potential victims. (Id. at 165–66, 170, 206:15-24) Lewis also interviewed Berge and received copies of her closing statements, which allowed him to confirm she was a victim of fraud. (Id. at 210:10-19, 212–13)

Once the FBI had the CART copy of the NLF Files from LoGrasso's computer,

---

[15] The account numbers for the Jefferson Bank and Center State Bank accounts were the same, indicating Jefferson Bank was acquired by Center State Bank.

the taint team reviewed the files related to the ASPR victims and sent the investigative team files of non-privileged records pertaining to eleven clients, including B.H. (Id. at 218:20-25; Dkt. 113 at 69–70) Hibbitts's interviews of B.H. and Mr. Nicoletti led Hibbitts to submit the subpoena request that revealed J.B. and J.P. as potential victims of NLF's fraud. (Id. at 80–86; Gov't Ex. 9) Then, Defendant, at the Government's request, provided NLF's complete non-privileged records for J.B. and J.P. (Gov't Ex. 10) These documents confirmed J.B. and J.P. were potential victims. (Dkt. 113 at 95–96) Next, the FBI subpoenaed bank records for J.B. and J.P., which showed NLF had diverted funds from J.B. and J.P.'s settlements to LoGrasso. (Gov't Ex. 6E; Dkt. 113 at 95–97)

The information Rozankowski obtained by searching through the NLF Files were the names of several potential victims who were not ASPR victims and documentation of a suspected fraud scheme that did not involve ASPR. The Government has not pursued an investigation or prosecution of the fraud against these potential victims, except for J.B. and J.P. The FBI discovered J.B. and J.P., however, through its investigation of the fraud against the ASPR victims through constitutional means. Even if Rozankowski had not searched the NLF Files on evidence.com, the PSO and the FBI had enough information to subpoena NLF and Jefferson, Center State, and Chase Banks. The information that resulted from these subpoenas allowed the investigators to confirm the names of the ASPR victims, interview them, discover the refund checks, and thereby discover that J.B. and J.P. were potential victims. Thus, the Court finds the evidence Defendant seeks to suppress is admissible under the

independent source doctrine.

Based on the foregoing, Defendant's Motion to Suppress, (Dkt. 65), is due to be **DENIED**.

### III.   CONCLUSION

Accordingly, it is hereby **ORDERED**:

1. Defendant Nicolette Renee Nicoletti's Motion to Suppress Illegally Obtained Evidence, (Dkt. 65), is **DENIED**.

2. Defendant's Motion to Disqualify Counsel for the Government, (Dkt. 66), is **DENIED**.

3. Defendant's Motion to Dismiss the Indictment for Loss or Destruction of Exculpatory Evidence, (Dkt. 67), is **DENIED**.

**DONE and ORDERED** in Tampa, Florida, this 23rd day of June 2025.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies to:**
Counsel of Record
U.S. Probation Office
U.S. Pretrial Services
U.S. Marshal Service